[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-14324

_____

RICHARD HICKS,
JOCELYN HICKS,

                                        Plaintiffs-Appellants,

*versus*

GREGORY MIDDLETON,
JOHN DOE, I,
MARINE TERMINALS CORPORATION - EAST,
d.b.a. Ports America,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:21-cv-00003-RSB-CLR

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

Appellants Richard Hicks and his wife, Jocelyn Hicks (collectively, the "Hickses"),[1] appeal the district court's grant of summary judgment in favor of Marine Terminals Corporation - East, d/b/a Ports America ("Ports America"). At issue here, the Hickses brought claims for monetary damages against Ports America after its employee, Gregory Middleton, hit and injured Richard Hicks with his vehicle. The district court ruled that Ports America could not be held vicariously liable as Middleton's employer because Middleton did not injure Hicks while acting within the course and scope of his employment with Ports America. Therefore, the court granted summary judgment in favor of Ports America.

---

[1] Jocelyn Hicks's "loss of consortium claim is derivative of [her] spouse's personal injury action," and "[a]ll claims which derive from the personal injuries sustained by a single individual' [are properly] joined in a single action . . . ." *Miller v. Crumbley*, 548 S.E.2d 657, 658 (Ga. Ct. App. 2001) (quotations omitted) (citing *Stenger v. Grimes*, 400 S.E.2d 318, 320 (Ga. 1991)). Accordingly, we do not separately discuss Jocelyn's claim. Additionally, where the singular, "Hicks," is used throughout this opinion, we are referring to Richard Hicks alone. Where the plural, "Hickses," is used throughout this opinion, we are referring to both Richard and Jocelyn.

After carefully reviewing the record and the parties' briefs, and with the benefit of oral argument, we vacate the district court's grant of summary judgment and remand the case for further proceedings.

## I.    BACKGROUND[2]

This case arose from a collision that occurred on November 7, 2020 at the Port of Savannah (the "Port") in Savannah, Georgia. The Hickses alleged that, while Richard Hicks was working as a longshoreman[3] on the Port, fellow longshoreman Middleton struck him with his personal vehicle as Hicks stood alongside another car. The Hickses sought to hold Middleton personally liable and Ports America vicariously liable for Richard's injuries and other monetary damages.

Ports America is one of three stevedoring companies that employs longshoremen to perform cargo operations. The Port where Hicks and Middleton worked is owned, operated, and controlled by the Georgia Ports Authority ("GPA"). However, private companies like Ports America perform cargo operations at the Port.

---

[2] Because we review the district court's grant of summary judgment to Ports America, we construe all facts and draw all reasonable inferences in favor of the Hickses, noting any disputed material facts. *Guevara v. Lafise Corp.*, 127 F.4th 824, 828 (11th Cir. 2025). Further, as we write for the parties, we recite only those facts needed to explain this decision.

[3] "Longshoremen" duties generally involve performing cargo operations on ships docked at the Port such as loading and unloading cargo.

Pursuant to a collective bargaining agreement, International Longshoreman's Association Local 1414 ("ILA 1414") provides workers to Ports America and the other stevedoring companies. Each working day, members of ILA 1414 hold meetings at a union hall located off-site from the Port, during which longshoremen are hired to work for the stevedoring companies like Ports America. The meetings are held exactly one hour before the time set for cargo operations to begin.

After being selected for employment, longshoremen then drive from the union hall to the Port, which takes approximately fifteen minutes. Upon arriving at the Port, longshoremen must present credentials at the security gate showing that they have been dispatched to work that day before they will be allowed on the Port's premises. An agreement between ILA 1414 and the stevedoring companies expressly prohibits anyone who has not been dispatched to work that day from coming upon the Port's premises, and anyone found on Port premises "who is not employed by" one of the stevedoring companies is subject to a fifteen-day suspension.

Once within the Port, longshoremen must complete several tasks (the "pre-ship duties") before they are permitted to begin working on a ship. Among other pre-ship duties that must be completed before cargo operations commence, longshoremen are required to obtain documents called "game plans," which show the manner and order in which cargo will be unloaded and loaded on the assigned ship. Ports America creates the game plans "in advance so the work can be done more efficiently," and

longshoremen usually retrieve the game plans from the "dock house" located nearest to the "cargo berth" ("CB") where the assigned ship is docked. There are four or five dock houses at the Port, and the CBs are designated in numerical order from CB1 to CB9 along the edge of the Port closest to the water. Because GPA does not allow individuals to walk on Port premises, those who work at the Port generally must drive their personal vehicles while inside.

According to Ports America's corporate representative, retrieving the game plans is part of the "whole job" of being a longshoreman. Nevertheless, longshoremen are not paid for the time it takes them to retrieve the game plans. Indeed, the pay period for longshoremen does not start until the commencement of cargo operations, at which point they must have completed all their pre-ship duties.

On the day that Hicks was injured, Middleton drove to the Port and arrived approximately twenty-three minutes before cargo operations were set to begin. While driving through the Port to obtain his game plans, Middleton crossed the center line of the roadway, entered the wrong lane of travel, and struck Hicks. The incident occurred behind the dock house located nearest to CB8, but Middleton had actually been assigned to work on a ship docked at CB4.

When asked why he had driven past the dock house nearest to his assigned ship, Middleton stated that he thought he had been assigned to a ship docked "somewhere between" CB7 and CB9. He

testified that he had been driving to the dock house "[f]or the purpose of picking up" his game plans when the accident occurred, and he also planned to heat up his lunch while at the dock house. Tests conducted after the incident revealed that Middleton had been driving while impaired by fentanyl and other drugs.

Because Middleton never reported to his assigned ship, Ports America did not pay him for any work performed that day. Middleton testified, however, that he had "already been hired" by Ports America when the incident occurred and confirmed that work was the only reason he was at the Port that day. Ports America's corporate representative likewise confirmed that when Middleton "was hired in the [union] hall, he was hired to work for Ports America."

## II.    PROCEDURAL HISTORY

The Hickses sued Middleton and Ports America in Georgia state court, and Ports America removed the case to federal court based on diversity jurisdiction. In their complaint, the Hickses sought monetary damages for Hicks's injuries caused by the collision, which required Hicks to undergo "extensive" hospitalization and rehabilitation, and for his wife's loss of consortium. They alleged Middleton was directly liable for their injuries and that, because Middleton injured Hicks while "on duty" for Ports America and in his capacity as an "employee" of Ports America, Ports America was vicariously liable.

Following discovery, Ports America moved for summary judgment on the ground that Middleton was not acting within the

course of his employment when he struck Hicks. Specifically, Ports America argued that Middleton never became an employee given that he had not reported to his assigned ship when the incident occurred. Next, Ports America asserted that even if Middleton already had been hired to work at the time of the accident, he never actually started working and, thus, was not yet "on the clock." Alternatively, Ports America contended that Middleton departed from the course and scope of his employment when he drove past the ship that he had been assigned to and went to heat up his lunch in an area of the Port where he had "no work-related reason to be."

In response, the Hickses maintained that the issue of when Middleton's employment with Ports America began was a jury question, the answer to which would determine the scope of Ports America's liability. In particular, they argued that the evidence weighed as much in favor of finding that Middleton's employment began when he arrived at the Port, especially because retrieving the game plans was a necessary part of his job responsibilities. They also asserted that Middleton's frame of mind, *i.e.*, his sincere belief he was headed towards the right ship, supported a finding that Middleton's presence at the Port was as a Ports America employee when he struck Hicks.

The district court ultimately granted Ports America's summary judgment motion. As to the scope of employment issue, the court determined that there was no set of facts that would support a jury finding that Middleton injured Hicks while acting within the scope of his employment. The court reasoned that the evidence

established that the incident occurred during Middleton's commute, and, under Georgia law, an employee's commute is a purely personal activity that does not fall within the scope of employment. The court further found that, even assuming that Middleton's commute had ended when he reached the area near his assigned ship, he still only "engaged in a purely personal matter" by driving to another area of the Port.  Moreover, the court rejected the argument that obtaining game plans fell within his "scope of employment," because Ports America itself never asked or directed Middleton to do so.  The court, therefore, dismissed the Hickses' claims against Ports America, but certified its judgment as immediately appealable under Rule 54(b) of the Federal Rules of Civil Procedure.  The Hickses timely appealed.

## III.    STANDARD OF REVIEW

"We review a district court's decision on summary judgment *de novo* and apply the same legal standard used by the district court, drawing all inferences in the light most favorable to the nonmoving party . . . ."    *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017).  Summary judgment is warranted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  It is the function of a jury to weigh the evidence, make

credibility determinations, and draw any legitimate inferences from the facts. *Id.*

## IV.    DISCUSSION

On appeal, the Hickses largely repeat the arguments they made at summary judgment—that Middleton's presence at the Port and his actions, which were aimed at obtaining the game plan, could also support a factual finding in their favor, thus precluding summary judgment in Ports America's favor. Within that fact-based inquiry, they carve out the specific question of whether Middleton driving to the wrong place within the Port to retrieve game plans was just a slight deviation or complete departure from the course and scope of his employment for purposes of determining liability. Ports America responds that, as an initial matter, summary judgment was proper because the Hickses never actually established (and the district court never addressed) whether Middleton was even an employee at the time of the incident, let alone acting within the scope of his employment. In any event, Ports America argues, the district court's stated reasons for dismissal—that the incident occurred while Middleton was engaged in the personal act of commuting—support the district court's decision as well.

Sitting in diversity, we apply Georgia law, and we "decide issues of state law 'the way it appears the state's highest court would.'" *Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1310 (11th Cir. 2021) (quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001)). Under Georgia law, "an

employer is liable for a tort committed by [its] employee where the injury is inflicted in the course and scope of employment and not because of some private and personal act of the employee." *Odom v. Hubeny, Inc.*, 345 S.E.2d 886, 887 (Ga. Ct. App. 1986). To hold an employer liable under a *respondeat-superior* theory, the employee (1) must be acting "in furtherance of the [employer's] business;" and, (2) "must be acting within the scope of his [employer]'s business." *Piedmont Hosp., Inc. v. Palladino*, 580 S.E.2d 215, 217 (Ga. 2003). Whether a party has satisfied both elements is generally a question for a jury. *See Prodigies Child Care Mgmt., LLC v. Cotton*, 893 S.E.2d 640, 646 (Ga. 2023).

Summary judgment for the employer is not appropriate unless "the evidence and all reasonable inference drawn therefrom show that the employee was not engaged in furtherance of the employer's business, but [instead] was on a private enterprise of the employee's own." *Id.* at 647 (quoting *Chorey, Taylor & Feil, P.C. v. Clark*, 539 S.E.2d 139 (Ga. 2000)). Stated differently, a court can only dismiss a *respondeat-superior* claim as a matter of law if there is "plain and undisputable" evidence that the employee was not acting to further his employer's business but rather was acting outside the scope of his employment. *Id.* (citation omitted).

In evaluating an employer's liability where an employee commits a tort while driving, Georgia courts adhere to "a longstanding general rule that an employee is engaged in a purely personal matter while commuting to . . . work," thus precluding liability against the employer for torts arising during the employee's

commute. *Centurion Indus., Inc. v. Naville-Saeger*, 834 S.E.2d 875, 878–79 (Ga. Ct. App. 2019). An employer likewise cannot be held liable under Georgia law where an employee deviates from a "normal route" and completely departs from the scope of employment to engage in a purely personal pursuit like driving to a restaurant on a lunch break. *See Elliot v. Leavitt*, 178 S.E.2d 268, 274 (Ga. Ct. App. 1970) (explaining that an employee's complete departure from the scope of employment will exonerate an employer from liability as a matter of law). However,

> [w]here the evidence shows that the employee was not taking the shortest or most direct route for the performance of the duties of his employment, . . . whether the deviation was so substantial as to constitute a departure from the employment, or whether he was nevertheless acting within the scope of his employment, is generally a question of fact for the jury.

*Davis Gas Co. v. Powell*, 232 S.E.2d 258, 260 (Ga. Ct. App. 1976); *see also Prodigies Child Care Mgmt.*, 893 S.E.2d at 653 (Peterson, P.J., concurring) ("[T]he question of when mid-commute work-related activity rises to the level of scope and furtherance will almost always be for a jury to decide.").

In the Hickses' case, the evidence in the record, Georgia law, and the summary judgment standard all mandate that the questions of (1) whether Middleton was acting in furtherance of Ports America's business, and (2) whether Middleton was acting within

the scope of his employment be presented to a jury. Both elements of the Hickses' *respondeat-superior* claims are generally jury questions under Georgia law, and the evidence in this case is not "plain and undisputable" such that those issues were proper for resolution at the summary judgment stage.[4] *See Prodigies Child Care Mgmt.*, 893 S.E.2d at 646–47 (citation omitted).

Regarding the first element of the Hickses' *respondeat-superior* claims, a factual dispute exists as to whether Middleton injured Hicks while acting "in furtherance of" Ports America's business. *See Piedmont Hosp., Inc.*, 580 S.E.2d at 217 (citations omitted). On one hand, a jury could agree with Ports America that Middleton had not yet begun furthering Ports America's business when the incident occurred. However, reviewing the evidence in the light most favorable to the Hickses, which we must, also supports a reasonable conclusion that Middleton was "on the clock" as soon as he set foot on the Port or, at the very least, when his intention was to get the game plan and he thought he was headed in the right direction. *See Edmondson*, 43 F.4th at 1159.

Specifically, given the unique circumstances of working at the Port, the issue of whether and when Middleton's commute ended is anything but "plain and undisputable." *Prodigies Child Care Mgmt.*, 893 S.E.2d at 647 (citation omitted). The evidence does not

---

[4] Additionally, because the district court did not decide whether Middleton qualified as a Ports America employee at the time of the incident in the first instance, we assume without deciding that Ports America employed Middleton at the time of the incident.

compel a conclusion either way, but it would not be unreasonable for a jury to infer that Middleton's commute ended when he ceased driving on public roads, passed through the security gates at the Port, and entered an area where only individuals who were designated to work were allowed to be present. Even assuming that Middleton's commute continued once inside the Port, a jury could reasonably find that, at the point he headed to pick up his game plans—a task that clearly is part of his pre-ship duties rather than "some private and personal act," *Odom*, 345 S.E.2d at 887—he was acting "in furtherance of" Ports America's business such that his commute concluded, *Prodigies Child Care Mgmt.*, 893 S.E.2d at 647 (citation omitted). Indeed, the evidence reflects that Ports America created the game plans "in advance so the work can be done more efficiently," and that longshoremen were required to drive to pick up their game plans because GPA did not allow individuals to walk to and from different areas on Port premises. Based on such evidence, it would not be unreasonable for a jury to conclude that Ports America benefited from Middleton driving to pick up his game plans such that his commute concluded at the point he began performing the pre-ship duty and that the incident occurred while he acted "in furtherance of" Ports America's business. *Piedmont Hosp., Inc.*, 580 S.E.2d at 217 (internal quotation marks and citations omitted).

As to the second element of the Hickses' *respondeat-superior* claims, a factual dispute likewise exists about whether Middleton injured Hicks while acting "within the scope of" his employment with Ports America. *See id.* (internal quotation marks and citation

omitted).  Similar to the issue of whether Middleton injured Hicks while furthering Ports America's business, a jury could reasonably infer from the evidence showing that longshoremen are required to obtain game plans but prohibited from walking on Port premises that the act of driving to retrieve the game plans fell within the scope of Middleton's employment.  Drawing all legitimate inferences in favor of the Hickses, a jury could find in the Hickses' favor with respect to both elements, thus setting the factual basis for a legal analysis on the vicarious-liability issue.  *See Edmondson*, 43 F.4th at 1159.

Moreover, the evidence reflects that, even though Middleton was in the wrong area of the Port when the incident occurred, he was not there to engage in some "private enterprise" of his own, but instead because he sincerely, albeit mistakenly, believed that his game plans were located there.  *See Prodigies Child Care Mgmt.*, 893 S.E.2d at 647 (citation omitted).  Whether his mistaken belief concerning the location of his game plans resulted in a deviation "so substantial as to constitute a departure from [his] employment" remains "a question of fact for the jury."  *Davis Gas Co.*, 232 S.E.2d at 260.  Because the evidence in this case "is such that a reasonable jury could return a verdict" in favor of the Hickses' *respondeat-superior* claims, the district court erred in granting summary judgment to Ports America.  *Edmondson*, 43 F.4th at 1159 (quotation marks and citation omitted).

### V.    CONCLUSION

In light of the foregoing, we vacate the district court's entry of summary judgment in favor of Ports America and remand this case for further proceedings.

**VACATED AND REMANDED.**