**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 22-11541

————————————————

JAMES DARYL WEST,

*Plaintiff-Appellant,*

*versus*

SABRINA SCHULTZ,
   Food Service Employee,
DIANN SPRATT,
   Food Service,
WEXFORD HEALTH SOURCES, INC.,
   a corporation,

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:16-cv-00694-SPC-NPM

————————————————

Before LUCK, LAGOA, and ABUDU, Circuit Judges.

PER CURIAM:

James West has had chronic pain since a prison bus accident in 1999.  By 2014, West was incarcerated at Charlotte Correctional Institution.  While at Charlotte Correctional, West saw five different Wexford Health Sources, Inc. medical providers—Dr. Carmello Berrios, Nurse Karen Blankenship, Dr. Howard Wetterer, Nurse Bonnie LaRosa, and Dr. Ronald Hemphill—who implemented a treatment plan for his chronic pain that included taking x-rays, diagnosing his various injuries in his back, right knee, and right foot, and giving him pain medicine, a cane, analgesic balm, and temporary medical passes limiting his required work.  West worked in the food service unit at Charlotte Correctional where his supervisors—Diann Spratt and Sabrina Schultz—required him to cut vegetables while sitting on an upside-down trashcan and carry heavy bags of vegetables.

West sued Wexford, his medical providers, and his food service supervisors under 42 U.S.C. section 1983.  He brought a municipal liability claim against Wexford for having a policy or custom that was deliberately indifferent to his necessary medical care, in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  He brought deliberate indifference claims against his medical providers, alleging that they violated the Eighth Amendment because they should have ordered more diagnostic testing or treatment.  And he brought similar deliberate indifference claims against his food service supervisors, alleging that they violated the Eighth Amendment because their orders to sit on the trashcan and lift heavy bags caused him unnecessary pain.

The district court dismissed West's claim against Ms. Schultz—the food service supervisor—for lack of service of process because the district court ordered two specially appointed process servers and the United States Marshals Service to serve Ms. Schultz four times over several years but none of them were successful. The district court also dismissed West's claims against the medical providers for failure to state an Eighth Amendment claim because West did not plausibly allege facts showing that they were deliberately indifferent to his serious medical needs. Following discovery, the district court granted Wexford's and Ms. Spratt's motions for summary judgment. There was no evidence, the district court explained, that Wexford had a policy or custom that was deliberately indifferent to West's medical needs or that Ms. Spratt's orders caused West any more pain than he was already experiencing from his 1999 bus accident.

The district court entered judgment for the defendants, and West appealed. After careful review, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND

West alleged these facts in his fourth amended complaint. In September 1999, he began serving his prison sentence. Before his incarceration, he already had two surgeries on his right knee. Those injuries were exacerbated in October 1999, when West was

involved in a prison bus accident. After the accident, West had constant pain in his back, right knee, and right foot.

*Pre-Fall Medical Care*

The pain continued through October 2014, when West was moved to Charlotte Correctional. Wexford was the medical provider at the prison, and West saw its providers throughout the summer and fall of 2015.

In June 2015, West saw Dr. Berrios and told him about his chronic pain. In response, Dr. Berrios ordered x-rays on West's knee, and gave him prescription ibuprofen, analgesic balm, a cane, and temporary medical "passes for restricted activity, light duty, limited standing, no bending, [and no] lifting over [fifteen] pounds."

After seeing Dr. Berrios, West put in another treatment request for his chronic pain. This time he saw Nurse Blankenship and told her that he wanted the x-rays Dr. Berrios ordered and for her to issue a bed-rest medical pass that would get him out of his food service job. She re-ordered the x-rays but declined to issue any additional medical passes. West saw Dr. Berrios again, and he diagnosed West with "osteoarthritis, degenerative joint disease, and chronic pain." West requested additional diagnostic testing, but Dr. Berrios denied his request. Dr. Berrios told West that Wexford had a policy restricting necessary medical care.

Despite his diagnosis and medical passes, West was still required to work in Charlotte Correctional's food service unit. Ms. Schultz and Ms. Spratt—as West's supervisors—were aware

that he had medical passes limiting his ability to bend over and lift heavy objects. But they made West sit on an upside-down trashcan to cut vegetables. And they made him lift bags of vegetables weighing over fifteen pounds.

### Post-Fall Medical Care

West's chronic pain was particularly severe on June 27, 2015, before he started the day's work in the food service unit, so he put in another treatment request and was taken to Nurse LaRosa. Nurse LaRosa gave him ibuprofen and analgesic balm. Afterward, West went to the food service unit, where he was ordered to move a seventy-five-pound bag of vegetables. When he picked up the bag, he fell and experienced even more pain than normal. He could not get up, so he was taken out of the food service unit in a wheelchair and sent back to Nurse LaRosa. But Nurse LaRosa concluded that "nothing ha[d] changed" from the previous visit that morning, so she declined to provide West with any additional treatment.

Two days later, on June 29, 2015, West put in another treatment request for his pain and saw Nurse Blankenship. He told Nurse Blankenship about his recent fall, but she refused to provide West more treatment because she believed he "was lying about his accident."

A month later, in August 2015, West put in another treatment request for his pain. Again, he saw Nurse LaRosa, who readjusted his knee brace after concluding it was too tight but declined to order more diagnostic testing. That same month, West

requested treatment again for his chronic pain.  This time he saw Dr. Wetterer, who also declined to order additional diagnostic testing and did not refill West's prescriptions for "[m]otrin, [p]rednisone, [or p]nerenegan."  Like Dr. Berrios, Dr. Wetterer told West that Wexford had a policy restricting necessary medical care.

West's last medical provider at Charlotte Correctional was Dr. Hemphill, who treated West three more times for his chronic pain.  First, in October 2015, Dr. Hemphill ordered more x-rays on West's right knee and ordered new x-rays on his right foot but declined to order any x-rays on West's back.  Second, Dr. Hemphill reviewed the x-ray results, "gave [West] painkillers," diagnosed him with "osteophytosis of the medial compartment and patellofemoral joint," but declined to offer additional diagnostic testing. At the last visit, in November 2015, West again requested diagnostic testing, but Dr. Hemphill again declined.  Like the other doctors, Dr. Hemphill told West that Wexford had a policy restricting necessary medical care.

### PROCEDURAL HISTORY

*West's Complaint and the District Court's Order Dismissing West's Claim Against Ms. Schultz*

In 2016, West filed a pro se complaint, which brought section 1983 claims against his medical providers (Dr. Berrios, Nurse Blankenship,  Dr. Wetterer,  Nurse LaRosa,  and  Dr. Hemphill),

Wexford, Ms. Spratt, and Ms. Schultz. West was allowed to proceed in forma pauperis.

Because of his in forma pauperis status, the district court appointed Charlotte Correctional's warden and assistant warden to serve process on the defendants on May 16, 2018. The defendants were successfully served except for Ms. Schultz. So, the district court ordered the Florida Department of Corrections to provide Ms. Schultz's last known address. Once the Department complied, the district court ordered the Marshals Service to try to serve Ms. Schultz again on November 20, 2018. When the second attempt failed, the district court ordered the Marshals Service to serve Ms. Schultz for the third time on February 16, 2021. After the third attempt failed, the district court dismissed West's claim against Ms. Schultz without prejudice.

West moved to reinstate the dismissed claim because he found an additional address for Ms. Schultz. The district court granted his motion, vacated its previous dismissal, and ordered the Marshals Service to try to serve Ms. Schultz for the fourth time. When the fourth attempt failed, the district court dismissed West's claim again. West tried to reinstate the claim a second time, but the district court denied the motion, explaining that "[Ms.] Schultz . . . ha[d] not been served with process, despite multiple attempts over several years."

*The District Court's Order Dismissing West's Claims Against the Medical Providers*

An attorney representing West filed the fourth amended complaint. In that complaint—the operative one—West brought Eighth Amendment deliberate indifference claims against the medical providers, alleging that they violated his Eighth Amendment right to be free from cruel and unusual punishment because they were deliberately indifferent to his serious medical needs. He brought a municipal liability claim against Wexford, alleging that it had a policy or custom that was deliberately indifferent to his necessary medical care, in violation of his Eighth Amendment right. And he brought a claim against Ms. Spratt, alleging that she violated the Eighth Amendment because her orders to sit on the trashcan and lift heavy bags were deliberately indifferent to West's pain.

The medical providers moved to dismiss West's complaint for failure to state a claim, which the district court granted. The district court dismissed West's claims against his medical providers because West failed to plausibly allege that they violated the Eighth Amendment. The district court explained that the allegations that the medical providers denied West additional diagnostic testing and treatment amounted to a difference of opinion on the right way to treat West's pain, which was not deliberate indifference. And Nurse Blankenship's and Nurse LaRosa's refusal to treat West after his fall in the food service unit was not deliberate indifference because they did not believe that West was injured, and thus, West

had not alleged that they were subjectively aware of his serious medical needs.

*The District Court's Order Granting Wexford's and Ms. Spratt's Motions for Summary Judgment*

After discovery ended, Wexford and Ms. Spratt moved for summary judgment, arguing that there was no genuine dispute as to any material fact and that they were entitled to judgment as a matter of law. The district court agreed and granted their motions. As to Wexford, the district court explained that "[t]here [w]as no evidence" that Wexford had a policy or custom of denying necessary medical care. In fact, the district court pointed to Wexford's official policies, which required the company to provide necessary medical care, and the testimony of Wexford's providers, who declared that they never denied necessary treatment to cut costs.

As to Ms. Spratt, the district court concluded that there was no evidence that her orders—to cut vegetables while sitting on an upside-down trashcan and to carry bags of vegetables—caused an injury to West. The summary judgment evidence, the district court explained, showed that West's chronic pain was caused by the bus accident in 1999 and Ms. Spratt's orders did not cause West any additional pain beyond what he had already been experiencing from the accident.

**STANDARD OF REVIEW**

Three standards of review govern this appeal. First, for the dismissal for failure to serve process, we review for an abuse of discretion. *See Rance v. Rocksolid Granit USA, Inc.*, 583 F.3d 1284, 1286

(11th Cir. 2009).  Second, for the dismissal for failure to state a claim, we review de novo, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012) (quotation omitted).  "To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).

Third, we review a district court's summary judgment de novo, "draw[ing] all inferences and review[ing] all evidence in the light most favorable to the non-moving party." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).  To grant summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## DISCUSSION

We divide our discussion into three parts.  First, we consider the district court's dismissal of the claim against Ms. Schultz for failure to serve process.  Second, we address the district court's dismissal of the Eighth Amendment deliberate indifference claims against the medical providers for failure to state a claim.  And third, we discuss the district court's summary judgment for Wexford and

Ms. Spratt on West's municipal liability and deliberate indifference claims.

*Dismissal of the Claim Against Ms. Schultz for Failure to Serve Process*

West contends that the district court abused its discretion by dismissing his claim against Ms. Schultz for failure to serve process. He argues the district court did not make reasonable efforts to serve Ms. Schultz before dismissing the claim.

Federal Rule of Civil Procedure 4(m) provides that "[i]f a defendant is not served within [ninety] days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). "But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id*.

When a pro se plaintiff is proceeding "in forma pauperis," the district court must order the Marshals Service or "a person specially appointed by the court" to serve process on the defendants. *See* Fed. R. Civ. P. 4(c)(3). An incarcerated plaintiff proceeding "in forma pauperis" can show "good cause" to extend the deadline to serve process "for an appropriate time" when the Marshals Service or a specially appointed person cannot serve process within the initial ninety-day period. *See Rance*, 583 F.3d at 1288. But once an appropriate time has lapsed and the defendant still cannot be served process despite "reasonable effort[s]" to do so, the district court may dismiss the claim under Rule 4(m). *See Richardson v. Johnson*, 598 F.3d 734, 740 (11th Cir. 2010).

Here, West—an incarcerated plaintiff proceeding in forma pauperis—filed his initial complaint on September 2, 2016. As required by Rule 4(c), the district court first appointed Charlotte Correctional's warden and assistant warden to serve Ms. Schultz on May 16, 2018. *See* Fed. R. Civ. P. 4(c). Once the wardens notified the district court that they were unable to serve her, the district court ordered the Florida Department of Corrections to provide Ms. Schultz's last known address. When the Department did so, the district court ordered the Marshals Service to try to serve process on her on November 20, 2018. When the second attempt failed, it ordered the Marshals Service to try a third time on February 16, 2021. After the third attempt failed, the district court dismissed West's claim without prejudice on May 10, 2021—1,711 days after filing his initial complaint. When West moved to reinstate his claim after finding a new address for Ms. Schultz, the district court granted the motion, vacated the prior dismissal, and ordered the Marshals Service to try—for the fourth time—to serve process on Ms. Schultz. When the fourth attempt failed, the district court dismissed West's claim again.

That is, the district court ordered Ms. Schultz's former employer to provide her last known address and ordered both specially appointed process servers and the Marshals Service to serve Ms. Schultz four different times over 2,088 days from when the complaint was originally filed—almost two thousand days over the initial ninety-day service period provided by Rule 4(m). *See* Fed. R. Civ. P. 4(m). That's more than enough "reasonable effort" to support dismissal under Rule 4(m). *See Richardson*, 598 F.3d at 740.

West counters that the dismissal was improper because the district court never explicitly found that there were "reasonable effort[s]" made to serve Ms. Schultz. *See Id.* But the district court need not use magic words to exercise its discretion to dismiss West's claim under Rule 4(m). Instead, we can "infer . . . implied factual findings that are consistent with" the district court's "explicit factual findings and conclusion[s.]" *United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc) (collecting cases inferring implied factual findings); *see also United States v. Watkins*, 13 F.4th 1202, 1213–14 (11th Cir. 2021) (same). In its order dismissing West's claim against Ms. Schultz, the district court went through the reasonable efforts that had been made to try to serve Ms. Schultz. Still, the district court ordered the Marshals Service to make another final attempt before dismissing West's claim for the second time. By recounting the reasonable efforts to serve Ms. Schultz in its dismissal order and by ordering another attempt to serve Ms. Schultz before dismissing the claim a second time, we can infer that the district court impliedly found that "reasonable effort[s]" were made to serve Ms. Schultz. *See Richardson*, 598 F.3d at 740. Based on its implied finding, the district court was within its discretion to dismiss West's claim against Ms. Schultz under Rule 4(m).[1] *See id.*

---

[1] The district court properly dismissed West's claim against Ms. Schultz without prejudice for failure to serve process. *See* Fed. R. Civ. P. 4(m); Adam N. Steinman, *Federal Practice and Procedure* § 1137 (4th ed. Apr. 2025 Update) ("It is worth emphasizing that Rule 4(m) does not permit dismissals with prejudice."). Although the final judgment was entered against West with prejudice,

*Dismissal of the Deliberate Indifference Claims Against the Medical Providers*

Next, West argues that the district court erred in dismissing his Eighth Amendment deliberate indifference claims against the medical providers—Dr. Berrios, Nurse Blankenship, Dr. Wetterer, Dr. Hemphill, and Nurse LaRosa.  This argument fails for two reasons.

First, "[w]hile we read briefs filed by pro se litigants liberally, issues not briefed on appeal by a pro se litigant are deemed abandoned." *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (quotation and emphasis omitted).  Because West did not appeal the dismissal of his claims against the medical providers in his initial brief, those claims have been abandoned. *See id.*  Indeed, West's intent could not have been clearer—he left out the medical providers as parties in his notice of appeal. *Cf. Osterneck v. E.T. Barwick Indus.*, 825 F.2d 1521, 1529 (11th Cir. 1987) (dismissing an appeal against parties not named in the notice of appeal because the notice of appeal "expressly name[d] some . . . opponents but fail[ed] to include [the] other[s]").  He cannot resurrect his abandoned claims against the medical providers in a supplemental brief. *See United States v. Levy*, 379 F.3d 1241, 1242–43 (11th Cir. 2004) (collecting

---

our review of the record shows that the district court dismissed West's claim against Ms. Schultz *without prejudice* consistent with Rule 4(m).  *See* Fed. R. Civ. P. 4(m).  With that understanding of the record, we affirm the district court's dismissal of the claim without prejudice.

cases explaining that arguments raised for the first time in "supplemental briefs" are abandoned).[2]

Second, even if West had not abandoned his deliberate indifference claims against the medical providers, we agree with the district court that West failed to state a claim. The Eighth Amendment prohibits inflicting "cruel and unusual punishment[.]" U.S. Const. amend. VIII. "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if [he or she] is deliberately indifferent to" an inmate's serious medical needs. *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016); *see also*

---

[2] The dissenting opinion says that applying, in this case, our "longstanding" rule "that an appellant who does not raise an issue in his opening brief may not do so . . . in a supplemental brief," *United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015) (en banc), arguably raises due process concerns because appointed counsel filed the supplemental brief. But "[a] plaintiff in a civil case has no constitutional right to counsel." *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999). So, it does not violate his constitutional rights to give him more process—appointed counsel and the opportunity to file a supplemental brief— than he is due. In any event, West's appeal was not "poorly presented," as the dissenting opinion claims. In fact, we initially denied his motion to appoint counsel because "exceptional circumstances" did not warrant it. *See id.* The only reason we appointed counsel was because a member of our court selected West's appeal for oral argument (based on his briefing) and our rules do not permit pro se prisoners to argue their own appeals. At that point, counsel had to be appointed. The bottom line is, with full briefing, appointed counsel, another round of supplemental briefing, and oral argument, there are no due process concerns—arguable or otherwise. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." (quotation omitted; alteration adopted)).

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To state a deliberate indifference claim, an inmate must show (1) an objectively serious medical need, (2) that the prison official was subjectively aware of, but was deliberately indifferent to, the serious medical need, and (3) causation.  *See Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019); *Stalley v. Cumbie*, 124 F.4th 1273, 1284 (11th Cir. 2024) (noting that the first element is "objective" while the second element is "subjective").

The first and third elements are fairly straightforward.  The first element—an objectively serious medical need—requires the inmate to show a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *See Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (quotation omitted).  And the third element—causation—requires the inmate to show that the prison official's deliberate indifference caused the inmate's alleged injury.  *See Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

The second element—deliberate indifference—has three requirements.  *See Stalley*, 124 F.4th at 1284.  The inmate must show that (1) "the official was subjectively aware that the inmate was at risk of serious harm[,]" (2) "the official disregarded that risk[,]" and (3) the official acted with "subjective recklessness as used in the criminal law."  *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)).  To show criminally reckless conduct, the inmate must

demonstrate that the official "actually knew his conduct—his own acts or omissions—put the [inmate] at substantial risk of serious harm." *Id.* (quotation omitted). But even if the official "actually knew of" the risk, the official "cannot be found liable . . . if he responded reasonably to th[e] risk." *Id.* (quotation omitted). Focusing the inquiry on criminal recklessness ensures that only "those who inflict punishment" will be liable under "the Eighth Amendment." *See id.* at 1259 (quotation omitted).

Because criminal recklessness requires actual knowledge that a prison official's own conduct puts an inmate at risk of serious harm, an inmate does not meet this element by showing that a prison official "should have known" about a risk of serious harm. *Id.* at 1257. Nor can an inmate meet this element by showing that a prison official knew that a preexisting injury—not the official's own conduct—put the inmate at risk of a serious harm. *Id.* at 1258–61. And "[m]ere negligence in diagnosing or treating a medical condition" is not enough to show deliberate indifference. *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).

For example, in *Estelle*, an inmate alleged that prison doctors were deliberately indifferent to his serious medical needs because they only treated his back pain with "rest, muscle relaxants[,] and pain relievers." 429 U.S. at 107. The inmate argued that the prison doctors should have taken more x-rays and provided additional treatments. *Id.* The Supreme Court concluded that the inmate failed to show an Eighth Amendment violation. *Id.* at 107–08. The Court explained that "[a] medical decision not to order an [x]-ray,

or like measures, does not represent cruel and unusual punishment." *Id*. at 107. The Court made clear that decisions not to provide "additional diagnostic techniques or forms of treatment" are "matter[s] for medical judgment" that can be, "[a]t most . . . medical malpractice," but not an Eighth Amendment violation. *Id*.

With this framework in mind, we begin with West's claims against the doctors and then address his claims against the nurses.

### Claims Against the Doctors

Drs. Berrios, Wetterer, and Hemphill treated West throughout the summer and fall of 2015. In June, West initially complained to Dr. Berrios about the pain in his back, right knee, and right foot. Dr. Berrios ordered x-rays on West's knee and gave him prescription ibuprofen, analgesic balm, a cane, and temporary medical "passes for restricted activity, light duty, limited standing, no bending, [and no] lifting over [fifteen] pounds." Dr. Berrios diagnosed West with "osteoarthritis, degenerative joint disease, and chronic pain" but did not order more diagnostic testing. In August, West complained to Dr. Wetterer about the same pain, but Dr. Wetterer did not order additional diagnostic testing and declined to refill West's prescriptions for "[m]otrin, [p]rednisone, and [p]nerenegan." Finally, in October and November, West saw Dr. Hemphill three different times, and during those visits Dr. Hemphill ordered more x-rays on West's right knee and foot, diagnosed West with "osteophytosis of the medial compartment and patellofemoral joint," gave West "painkillers," but declined to do more diagnostic testing on West's back.

Based on these facts, West has failed plausibly to allege an Eighth Amendment violation for deliberate indifference. As the Supreme Court explained in *Estelle*, the doctors' alleged failure to order "additional diagnostic" testing and more "forms of treatment" were "matter[s] for medical judgment" that did not constitute deliberate indifference. *See* 429 U.S. at 107; *see also Adams*, 61 F.3d at 1545 ("[A]s *Estelle* teaches, the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." (quotation omitted)); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (explaining that "a simple difference in medical opinion" cannot constitute deliberate indifference). Thus, the district court did not err in dismissing West's deliberate indifference claims against the doctors.

West counters that he still plausibly alleged that the doctors violated the Eighth Amendment because the doctors told him that Wexford had a policy of restricting necessary medical care. While we have explained that a medical provider violates the Eighth Amendment when he knows an inmate needs medical treatment but declines to provide it "for non-medical reasons," *see Ancata v. Prison Health Srvs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985), that is not what West alleged here. West did not allege that the doctors knew he needed additional diagnostic testing or treatment and withheld it because of Wexford's policy. The existence of the policy, without alleging that the doctors intentionally refused to

provide medical care they knew was necessary because of the policy, did not amount to an Eighth Amendment violation. *See Stalley*, 124 F.4th at 1286–87 (explaining that *Ancata* did not apply where there was no evidence showing the government officials "intentional[ly] refus[ed] medical care that they knew was necessary" (quotation omitted)). In other words, the policy is irrelevant if it was unconnected to the medical reason why the doctors refused to order more testing and treatment.

### Claims Against the Nurses

Nurses Blankenship and LaRosa also saw West in the summer of 2015 for pain in his back, right knee, and right foot. In early June, West first complained to Nurse Blankenship that the x-rays Dr. Berrios ordered had not been done, so she ordered them again at West's request. But she did not give him additional medical passes or order more testing. Next, West saw Nurse LaRosa for the same pain on the morning of his fall, and she gave him ibuprofen and analgesic balm. He then went to work, fell, and returned to Nurse LaRosa, who declined to provide him additional treatment because she concluded "nothing ha[d] changed" since the morning visit. Two days later, West saw Nurse Blankenship, complaining of the same pain from his recent fall, but she declined to treat him because she believed he "was lying about his accident." Finally, in August, West saw Nurse LaRosa again for his pain; she readjusted his knee brace after concluding it was too tight but declined to offer him more diagnostic testing and treatment.

This too fails plausibly to allege an Eighth Amendment violation. First, in addition to what the doctors provided, the nurses treated West's pain by ordering x-rays, giving him medicine, and adjusting his knee brace. Like with the doctors, the nurses' failures to order "additional diagnostic" testing and more "forms of treatment" were "matter[s] for medical judgment" that did not constitute deliberate indifference. *See Estelle*, 429 U.S. at 107; *see also Adams*, 61 F.3d at 1545; *Waldrop*, 871 F.2d at 1033. And second, the nurses declining to treat West after his fall was not deliberate indifference because, as alleged, they did not subjectively believe that West needed additional treatment. *See Wade*, 106 F.4th at 1255. Nurse Blankenship, as alleged in the fourth amended complaint, thought West "was lying about his accident[,]" and Nurse LaRosa thought "nothing ha[d] changed" between the first and second visits on the day of West's fall. Because the nurses "w[ere not] subjectively aware that [West] was at risk of serious harm," they could not be deliberately indifferent to his pain. *See id*. Thus, the district court did not err in dismissing West's Eighth Amendment claims against the two nurses.

Citing *Goebert*, the dissenting opinion says that West had an objectively apparent need for medical care and Nurse Blankenship and Nurse LaRosa should be charged with constructive knowledge of that need. But *Goebert* is inapposite. There, we charged the jailer with constructive knowledge because he was willfully blind to the pregnant plaintiff leaking amniotic fluid for days. 510 F.3d at 1318. The need for medical attention was apparent and obvious even to a lay person. Here, though, West's knee and back pain was not

nearly as apparent and obvious as a pregnant mother whose water broke. And, unlike the jailer in *Goebert*, Nurse Blankenship and Nurse LaRosa did not "ignore[ West's] daily requests for aid." *See id*. at 1328. Nurse Blankenship ordered x-rays at West's request. And Nurse LaRosa gave West medicine and balm, and adjusted his knee brace, when West complained of pain.

### *Granting Wexford's Motion for Summary Judgment on West's Municipal Liability Claim*

West argues that the district court erred in granting Wexford's motion for summary judgment on his municipal liability claim, arguing that he provided sufficient evidence for a reasonable jury to conclude that Wexford had a policy or custom that was deliberately indifferent to his necessary medical care. We disagree.

"A private entity, like Wexford, that contracts to provide medical services to inmates performs traditional state functions and, therefore, is treated as a municipality for purposes of [section] 1983[.]" *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022). While a municipality cannot be held vicariously liable for its employee's constitutional violation, a municipality "may be held liable under [section] 1983 if its policy or custom causes the" violation of the inmate's constitutional right. *Id*. (citations omitted). So to plausibly allege a municipal liability claim, the inmate must show: "(1) that his constitutional rights were violated; (2) that the [municipality] had a custom or policy that constituted deliberate indifference of that constitutional right; and (3) that the policy or custom

22-11541              Opinion of the Court                    23

caused the violation." *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (quotation omitted).

To meet the second element, the inmate can point to an official municipal policy that is facially unconstitutional because it permits deliberate indifference to a constitutional right. *See Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022). Absent a facially unconstitutional policy, the inmate must show a "pervasive" custom of deliberate indifference that is "longstanding and widespread." *Craig v. Floyd County,* 643 F.3d 1306, 1310 (11th Cir. 2011) (quotation omitted). "A single incident" is not "pervasive" enough "to be a custom." *Id*. (quotation omitted). So, to show a pervasive custom that meets the second element, "a pattern of similar constitutional violations . . . is ordinarily necessary." *Id*. (quotation omitted).

For example, in *Craig*, a detainee had a brain injury that went undiscovered for nine days while he was in jail. *Id*. at 1309. During those nine days, the detainee saw several private medical providers working at the jail who gave the detainee painkillers rather than ordering a computed tomography scan that would have discovered the brain injury earlier. *See id*. The detainee brought a deliberate indifference claim against the company that employed the providers, alleging it had an unconstitutional policy of denying necessary computed tomography scans for cost reasons. *See id*. The district court granted summary judgment for the company because the detainee failed to provide any other instance of the company denying necessary medical care for cost reasons. *Id*. We affirmed,

explaining that "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees." *See id*. at 1312. Because the detainee relied solely "on his own experience," we held that there was insufficient "proof of a policy or custom" and, thus, his municipal liability claim failed. *See id*.

West's municipal liability claim against Wexford fails for the same reason. West did not provide any summary judgment evidence that Wexford had "a policy or custom" of denying necessary medical care. *See id*. Wexford's official written policies were not facially unconstitutional because the policies required Wexford employees to provide "medically necessary" care. And like the detainee in *Craig*, West failed to provide another instance, outside "his own experience," of Wexford denying necessary medical care to any other inmates. *See id*. Without any evidence showing a "longstanding and widespread" Wexford policy or custom of denying necessary medical care, the district court properly granted Wexford's motion for summary judgment. *See id*.

In response, West asserts that his pro se first amended complaint was a sworn statement that provided sufficient evidence for a reasonable jury to conclude that Wexford had an official policy or custom that was deliberately indifferent to his necessary medical care. Specifically, West points to the allegations in the first amended complaint that the medical providers told him during his medical appointments that Wexford had a policy or custom of denying necessary medical care.

While a verified, operative complaint may be offered by a party as summary judgment evidence, *see Roy*, 53 F.4th at 1348, the problem for West is that his first amended complaint became a "legal nullity" after it was amended. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("[T]he second amended complaint . . . superseded the former pleadings; the original pleadings were abandoned by the amendment," rendering the "first amended complaint . . . a legal nullity." (internal quotation omitted, alterations adopted)); *Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 463 F.3d 1210, 1215 (11th Cir. 2006) (concluding that the original complaint and its attachments could not be used against the plaintiff at a bench trial because "that pleading was wholly superseded by the amended complaint which proceeded under a different theory"); *Proctor & Gamble Def. Corp. v. Bean*, 146 F.2d 598, 601 n.7 (5th Cir. 1945) ("An amended pleading which is complete in itself and does not refer to or adopt a former pleading as a part of it, supersedes the former pleading. The original pleading is abandoned by the amendment[] and is no longer a part of the pleader's averments against his adversary." (quotation omitted)); *accord King v. Doogan*, 31 F.3d 344, 346 (5th Cir. 1994) (explaining that a plaintiff could not rely on a verified complaint as summary judgment evidence because that complaint was superseded by an unverified amended complaint). So it could not be used as summary judgment evidence.

West urges us to adopt the Fourth Circuit's approach in *Goodman v. Diggs*, 986 F.3d 493 (4th Cir. 2021). There, the pro se plaintiff offered his original verified complaint as summary

judgment evidence, even though the operative, amended complaint was unverified. *Id*. at 496, 498. The district court "ignor[ed]" the original "verified complaint[]" and granted the defendant's motion for summary judgment. *See id*. at 497. The Fourth Circuit reversed the decision because, it explained, a verified complaint can be considered as summary judgment evidence and an amended complaint only supersedes the previous one "for pleading purposes," but not for evidentiary purposes. *Id*. at 497–98 (emphasis omitted). The district court erred, the Fourth Circuit concluded, in ignoring the original verified complaint because that complaint retained its "evidentiary value" even after the amendment. *See id*. at 498–99 (emphasis omitted).

Even if we adopted the Fourth Circuit's approach, it would not help West. That's because the district court, when considering a summary judgment motion, "need consider *only* the cited materials." *See* Fed. R. Civ. P. 56(c)(3) (emphasis added). District "judges 'are not like pigs, hunting for truffles,'" so they "are not required to ferret out delectable facts buried in a massive record." *Cf. Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Unlike the pro se plaintiff in *Goodman*, West never asked the district court to consider his first amended complaint as summary judgment evidence in response to Wexford's motion for summary judgment. Instead, he attached an affidavit, along with twenty-seven other attachments to his response—all of which the district court considered—but not his first amended complaint. And notably, his affidavit and attachments did not show that Wexford had a policy or

custom of denying necessary medical care.  The district court did not err in failing to consider evidence that was not in "the cited materials" for summary judgment.  *See* Fed. R. Civ. P. 56(c)(3).

Beyond the allegations in his first amended complaint, West argues that Wexford's review policy—in which a secondary medical provider reviews the necessity of diagnostic testing or treatment that a primary medical provider recommends—supports a "reasonable inference" that Wexford had a facially unconstitutional policy denying necessary medical care to cut costs.  But Wexford's review policy cannot support West's municipal liability claim because this policy did not "cause[]" West's alleged Eighth Amendment violation.  *See McDowell*, 392 F.3d at 1289.  The review policy was never triggered in West's case because, as the evidence showed, his medical providers never recommended additional diagnostic testing or treatment that needed to be reviewed.

Finally, West points to Wexford's contract with the Florida Department of Corrections that required the Department to pay Wexford per inmate at the prison, meaning that Wexford was incentivized to keep down the average cost per inmate.  The contract, West contends, supports a reasonable inference that Wexford had an unconstitutional policy or custom of denying necessary medical care to cut costs.

But pointing to cost pressures alone is not sufficient to show an unconstitutional policy or custom.  *See Craig*, 643 F.3d at 1312.  The detainee in *Craig* made the same cost-pressure argument that the private company in that case was incentivized to "us[e] the least

costly means of treating" inmates.  *See id*.  Yet the detainee did not provide another instance outside of "his experience alone" that the company denied necessary medical care due to the cost pressure, so we rejected his argument and concluded he provided insufficient proof of an unconstitutional "policy or custom."  *Id*.  We reject West's argument for the same reason.  He has not provided another instance outside of "his experience alone" that Wexford's contract with the Department caused the denial of necessary medical care for costs reasons.  *See id*.

For its part, the dissenting opinion quotes reports from 2009, 2004, and "dating back to 2000," showing that Wexford initially reduced spending by maintaining lower health care staffing levels and that the company used inadequate medical record keeping, postponed specialty clinical visits, and had serious performance issues.  The dissenting opinion also cites an article with the number of malpractice claims against Wexford from 2008 to 2012.  But the reports and article do not show a pervasive pattern of Wexford refusing to treat patients with knee and back pain.

First, the reports are from six-to-fifteen years before West was treated by Wexford medical providers.  They say nothing about the pattern of medical care Wexford provided in the years before West was transferred.  Indeed, the bulk of the information in the dissenting opinion is focused on the initial period, in 2000, when the state moved to a private prison health-care system—which is fifteen years before the allegations in our case.  A six-to-fifteen-year gap is not a pattern and it is not pervasive.

Second, even if the reports were from the relevant period, they are not connected to West's allegations that the medical providers improperly treated his knee and back pain. The reports talk about staffing levels, record keeping, and postponed visits. But here the summary judgment evidence showed that West had numerous visits with five different medical providers during the summer of 2015, including twice on the day he fell. And the evidence showed the medical providers kept records of West's numerous visits.

Third, as to performance and malpractice issues, the Supreme Court has held that, alone, they are insufficient to show deliberate indifference. As Justice Thurgood Marshall explained in *Estelle*, evidence that a medical provider "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

*Granting Ms. Spratt's Motion For Summary Judgment on West's Deliberate Indifference Claim*

Finally, West argues that the district court erred in granting Ms. Spratt's motion for summary judgment on his Eighth Amendment deliberate indifference claim against her. Specifically, West contends that a reasonable jury could conclude that Ms. Spratt was

deliberately indifferent to West's pain while working in the food service unit.

Because West brought an Eighth Amendment deliberate indifference claim against Ms. Spratt, we apply the same legal standards that we did when evaluating his Eighth Amendment claims against the medical providers. *See Wade*, 106 F.4th at 1253, 1255 (explaining that the Supreme Court's decision in *Farmer* applied to deliberate indifference claims in a case involving prison medical providers); *Farmer*, 511 U.S. at 832–33 (providing the legal standards for an Eighth Amendment deliberate indifference claim in a case involving non-medical prison officials). "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if he is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Lane*, 835 F.3d at 1307. Thus, to establish an Eighth Amendment deliberate indifference claim against Ms. Spratt, West had to present evidence for a reasonable jury to conclude: (1) that West faced "a substantial risk of serious harm"; (2) Ms. Spratt's "deliberate indifference to that risk"; and (3) "causation." *Id*. (quotation omitted). As to the third element, in particular, West had to show that Ms. Spratt's deliberate indifference caused his alleged injury. *See Goebert*, 510 F.3d at 1326; *see also Cox v. Nobles*, 15 F.4th 1350, 1358 (11th Cir. 2021) ("Third, and finally, the plaintiff must demonstrate causation—that the constitutional violation caused her injuries.").

Here, West has not presented sufficient evidence for a reasonable jury to conclude that Ms. Spratt's orders to sit on the

trashcan and carry bags of vegetables caused West any more pain than he was already experiencing due to the 1999 bus accident. The evidence showed that West was already in severe and constant pain before he started working in the food service unit, and that he experienced the same pain long after he stopped working in the food service unit. But West did not present any summary judgment evidence that Ms. Spratt's orders exacerbated his preexisting injuries. Without sufficient evidence that Ms. Spratt's orders caused West additional pain, he has failed to show a genuine issue of fact on the causation element of his deliberate indifference claim. *See Lane*, 835 F.3d at 1307; *Goebert*, 510 F.3d at 1326.

Pushing back, West argues that his medical expert's report provided sufficient evidence for a reasonable jury to conclude that Ms. Spratt's orders injured him. But looking closely at the report, West's medical expert explained that West's preexisting injuries were aggravated by his fall on June 27, 2015, which occurred when Ms. Schultz, not Ms. Spratt, ordered West to move a heavy bag of vegetables. Ms. Spratt's timesheets confirmed that she was not working that day. So West cannot rely on the medical expert's report as summary judgment evidence supporting his claim against Ms. Spratt.

West also asserts that his fellow inmates' affidavits and his sworn statement in response to interrogatories provided sufficient evidence for a reasonable jury to conclude that Ms. Spratt's orders caused him unnecessary pain in violation of the Eighth Amendment. Specifically, the other inmates swore in their affidavits that

they observed West in pain when Ms. Spratt ordered him to cut vegetables on an upside-down trashcan, and West explained in his responses to interrogatories that he was in pain when Ms. Spratt ordered him to carry heavy bags of vegetables.

But the summary judgment evidence showed that West was already in constant and severe pain before he even started working under Ms. Spratt. That chronic pain was caused by his preexisting injuries from the 1999 bus accident, not Ms. Spratt's orders. So the general statements about West's pain while working in the food service unit did not provide sufficient evidence for a reasonable jury to conclude that Ms. Spratt's orders caused West additional pain than what he was already experiencing from his preexisting injuries.

## CONCLUSION

In sum, we affirm the dismissal without prejudice of West's claim against Ms. Schultz for failure to serve process, the dismissal with prejudice of West's claims against the medical providers for failure to state a claim, and the summary judgment for Wexford and Ms. Spratt.

**AFFIRMED.**

22-11541          ABUDU, J., Dissenting in part          1

ABUDU, Circuit Judge, Dissenting in part:

I agree with the Majority Opinion in dismissing the claims against Sabrina Schultz for failure to perfect service of process,[1] and in the dismissal of James West's Eighth Amendment claims against many of the medical providers. However, I otherwise conclude that West set forth a prima facie Eighth Amendment claim against Nurses Karen Blankenship and Bonnie LaRosa. Moreover, because a longstanding and widespread custom or policy as it pertains to a national for-profit prison company necessarily requires geographically broader considerations regarding its policies and customs, West satisfied his burden to overcome summary judgment in favor of Wexford Health Sources, Inc. ("Wexford"). Finally, the record also demonstrates that Diann Spratt's actions foreseeably exacerbated West's preexisting chronic pain, precluding summary judgment in her favor.

## I.     DISMISSAL OF MEDICAL PROVIDERS

At the motion-to-dismiss stage, a complaint survives Rule 12(b)(6) dismissal if its well-pleaded allegations, accepted as true, permit the reasonable inference that a defendant violated the plaintiff's constitutional rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In the Eighth Amendment context, a plaintiff must allege that

---

[1] As the Majority Opinion recounts, the district court took multiple reasonable efforts to effectuate service on Defendant Schultz, and West's case had already been pending for almost five years. The dismissal was without prejudice, and West had an opportunity to present "good cause" for failing to serve Schultz if, for example, she was evading service. FED. R. CIV. P. 4(m).

(1) he suffered from a serious medical need, (2) the defendant knew of and disregarded a substantial risk of serious harm, and (3) the disregard caused injury. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326–27 (11th Cir. 2007). The deliberate indifference inquiry has both objective and subjective components. *See Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024). At the pleading stage, a plaintiff need only plausibly allege that the defendant knew of and disregarded a substantial risk to the inmate's health. *See Iqbal*, 556 U.S. at 678; *Wade v. McDade*, 106 F.4th 1251, 1257 (11th Cir. 2024) (*en banc*).

West's complaint satisfied that standard with respect to Nurses Blankenship and LaRosa.[2] He alleged that both were aware of his chronic orthopedic and inflammatory pain, which had been

---

[2] Although the Majority contends that West cannot resurrect his claims against the medical providers in a supplemental brief, the Opinion nevertheless addresses the merits of those claims. It is important to note, however, that we appointed counsel precisely to assist West in developing arguments the Court believed warranted fuller treatment, and we directed that counsel file a supplemental brief toward that end. Counsel complied by submitting a comprehensive "supplemental opening brief" that ensured that West presented all the issues available to him on appeal. For the court to recruit and appoint counsel for their legal acumen and then leave them stuck with a poorly presented *pro se* appeal seems not only unfair, but arguably raises separate due process concerns regarding the purpose of a "supplemental" brief, which is understood as "supplying something additional; adding what is lacking." *Supplemental*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see generally United States v. Cordero*, 7 F.4th 1058, 1065 n.7 (11th Cir. 2021) (accepting additional arguments court-appointed counsel raised in a supplemental briefing, noting counsel had *also* adopted the defendant's *pro se* arguments).

repeatedly documented in his medical records, and that each deliberately refused to examine him after a workplace injury. According to the complaint, West was brought to the medical unit by wheelchair following a fall while carrying a heavy bag of vegetables. Nurse LaRosa told him "nothing ha[d] changed," refused to examine him, and declined to document the sick call visit. Two days later, Nurse Blankenship refused to examine West "in spite of his swollen knee and obvious pain," accused him of "lying about his accident," and threatened him with confinement "if he continued." Blankenship additionally declined to provide any pain relief or treatment. Both Blankenship and LaRosa knew of West's chronic condition yet denied even minimal evaluation or treatment.

Those allegations, taken as true, describe conduct far more serious than negligence or a difference in medical opinion. The operative complaint plausibly alleges the kind of deliberate inaction the Eighth Amendment forbids—refusal to treat an inmate who has an obvious injury and well-known chronic pain. *See Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1258 n.6 (11th Cir. 1999) (finding deliberate indifference where "although [the plaintiff's] needs were not so serious that a delay of a day or so would have been constitutionally intolerable, the weeklong delays he endured, a jury could conclude, were the product of deliberate indifference.")).

The Majority Opinion rejects West's deliberate indifference claim by adopting the defendants' asserted disbelief that West was injured. The Majority Opinion explains that the nurses refused to

4                    ABUDU, J., Dissenting in part                22-11541

treat West because they subjectively believed that he did not need treatment. However, our circuit precedent rejects that interpretation. As we discussed in *Goebert*, the issue is not whether they had *subjective* knowledge, but whether they had *constructive* knowledge. 510 F.3d at 1328 (citing *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 902 (11th Cir. 2003)). Specifically, "[a] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." *Id.* The Eighth Amendment's protections do not depend on whether a medical provider claims disbelief in an inmate's pain when the condition is objectively apparent. *Id.*

This duty is continuous: prior evaluations, limited interventions, or single instances of care do not necessarily fulfill the obligation when the underlying condition is ongoing. Like the repeated failures in *Goebert*, where the incarcerated person's daily complaints essentially went unaddressed over an extended period, each request for care triggers a renewed duty to respond. 510 F.3d at 1328. Here, West's complaint plausibly alleges that the nurses repeatedly failed to meet that duty. A patient in a wheelchair with a visibly swollen knee and chronic joint issues presents precisely the kind of serious medical need that gives rise to a duty to provide care—whether it be a more in-depth inquiry into the source of the pain, necessary additional medical treatment, or some other medical attention that does not summarily discount West's complaints. Accordingly, the allegations, liberally construed, go beyond negligence or disagreement about proper treatment; they describe the kind of deliberate inaction that *Goebert* recognizes as actionable under the Eighth Amendment. *Id.*

Applying that standard, the complaint adequately alleges that both Blankenship and LaRosa possessed at least constructive knowledge of West's serious condition and consciously disregarded it by refusing to examine or document his injury. That is sufficient to withstand a Rule 12(b)(6) motion. *See Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (finding that "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989))); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (recognizing that denial of care for non-medical reasons constitutes deliberate indifference). A reasonable factfinder could conclude that, based on inferences from these allegations, the risk to West's health was obvious, the nurses willfully blinded themselves to that risk, and such disregard was improper. *See also Hicks v. Middleton*, 141 F.4th 1174, 1180 (11th Cir. 2025) ("It is the function of a jury to weigh the evidence, make credibility determinations, and draw any legitimate inferences from the facts."); *cf. Goebert*, 510 F.3d at 1327.

By contrast, the allegations concerning Drs. Berrios, Wetterer, and Hemphill are different in kind. Those doctors examined West, ordered x-rays, and prescribed medication, though they declined to approve further specialist referrals. Their treatment decisions—however limited—suggest they exhausted the remedies available to them under Wexford's medical policies, which constrained the scope of care they could authorize and deliver. In that sense, their conduct reflects adherence to institutional, albeit unconstitutional, restrictions rather than personal disregard for

West's condition. Under our precedent, prison officials are not liable under the Eighth Amendment when they respond reasonably to risks within the confines of institutional policy. *See Ancata*, 769 F.2d at 705; *McElligott*, 182 F.3d at 1258; *Wade*, 106 F.4th at 1255. Accordingly, for these doctors, the appropriate inquiry is not individual culpability but whether Wexford's cost-containment policies themselves imposed unconstitutional limits on medical decisions. *See Ancata*, 769 F.2d at 705 (noting that policy-driven medical denials may give rise to municipal or corporate liability); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 304 (7th Cir. 2010) (same).

In sum, while the other medical personnel arguably followed the limits of their authority under Wexford's system, Nurses Blankenship and LaRosa went further—they refused outright to evaluate or treat an obviously injured patient. Under our precedent, those allegations suffice to state an Eighth Amendment claim. The district court's dismissal of the claims against them at the pleading stage was, therefore, improper.

## II.    SUMMARY JUDGMENT IN FAVOR OF WEXFORD AND SPRATT

The Majority Opinion affirms the district court's grant of summary judgment in favor of Wexford by framing West's claim as one grounded in his disagreement with the medical providers' judgment, and in favor of Spratt on the ground that West's complaints pertained to a preexisting condition. In addition to misstating the nature of West's claims and the extent of evidence introduced, the Majority Opinion too narrowly defines what constitutes

22-11541         ABUDU, J., Dissenting in part                    7

a "pervasive custom," especially given how states now deliver medical care in prisons. Moreover, as to Spratt, the Majority Opinion curtails the full scope of Eighth Amendment protections, which necessarily do reach acts that unduly exacerbate a preexisting condition, thus increasing the seriousness of the medical need for treatment.

### A. Wexford's Corporate Policy and Pattern of Conduct

Over the past decade, states have increasingly outsourced their correctional health care systems to large, for-profit providers.[3] These companies, like Wexford, operate across multiple states and within numerous facilities, often under standardized contracts and uniform cost-control policies. As a result, patterns of failures flowing from a single provider's customs or practices may manifest

---

[3] *See* Natalia Pires de Vasconcelos, *The Constitutive Contradictions of Prison Health Care in the United States*, PETRIE-FLOM CTR. (Apr. 18, 2025), [https://perma.cc/X77W-FQBM]; Micaela Gelman, *Mismanaged Care: Exploring the Costs and Benefits of Private vs. Public Healthcare in Correctional Facilities*, 95 N.Y.U. L. REV. 1386, 1391 (2020) (examining the structural deficiencies in the privatization of correctional healthcare, arguing that the market factors required for successful privatization—such as choice, competition, and responsiveness to consumer preferences—are absent in the correctional healthcare sector); Brian Nam-Sonestein, *Cut-Rate Care: The Systemic Problems Shaping Correctional Healthcare*, PRISON POL'Y INITIATIVE (Feb. 2025), [https://perma.cc/K34J-ZGVA] (describing systemic incentives and cost-control mechanisms that undermine incarcerate people's access to healthcare); *Florida Justice Institute Case Forces Change in Prison Health Care Policy*, FUNDING FLA. LEGAL AID (Sept. 26, 2018), [https://perma.cc/A3HD-75UR] (describing FJI's successful litigation that compelled the Florida Department of Corrections to reform its prison health care policies).

8                    ABUDU, J., Dissenting in part                    22-11541

across several institutions over several years, rather than within the confines of one facility or finite period of time.[4]

Unlike the plaintiff in *Craig v. Floyd County*, West submitted extensive materials showing that Wexford's treatment practices reflected a systemic pattern, not an isolated lapse, which impacted him beyond just a single incident, but instead impacted his ongoing experiences at the prison over a consistent period of time. 643 F.3d 1306, 1310 (11th Cir. 2011). This included independent, state-generated reports and public records documenting a pattern of Wexford's cost-based medical decisions and failures throughout Florida's correctional system.

First, West offered reports from the Florida Department of Corrections ("FDC") and the Florida legislature detailing longstanding deficiencies in Wexford's performance dating back to 2000, including repeated contract terminations for "serious performance issues." Those reports explained that the State's transition to privatized prison health care "was difficult," as litigation delayed implementation and prompted mass staff resignations. To meet contractual savings targets, vendors—including Wexford—"initially reduced spending by maintaining lower health care staffing levels," which, according to FDC staff, "led to serious performance

---

[4] *See, e.g.*, Peyton Holahan, *The Perils of Privatization: Exploring the Side Effects of Privatized Correctional Health Care in Favor of a Public Delivery Model*, 29 WASH. & LEE J. C.R. & SOC. JUST. 329, 334 (2023); Cary Aspinwall, Briana Bailey & Sachi McClendon, *This Company Promised to Improve Health Care in Jail. Dozens of Its Patients Have Died.*, MARSHALL PROJECT (July 30, 2024), [https://perma.cc/VY47-ARC9].

22-11541          ABUDU, J., Dissenting in part          9

issues in both contracts." This parallels West's allegation that Wexford's cost-driven policies limited clinicians from providing timely follow-up care or an examination after his fall.

Additionally, West submitted reports from 2004 and 2009 that the Florida Legislature's Office of Program Policy Analysis and Government Accountability published. Those reports maintained that the "quality of Wexford's health care had been problematic," identifying "repeated deficiencies," and that Wexford's corrective actions were not maintained. According to state auditors, inspections at Everglades, Dade, Broward, and Homestead correctional institutions, as well as the South Florida Reception Center, often showed "repeated deficiencies and a deteriorated level of service to the extent that the clinical quality of care required immediate action by the contractor." The issues cited included "inadequate medical record keeping, insufficient staffing, and postponement of specialty clinical visits." Those systemic deficiencies mirror West's own allegations: repeated postponements of follow-up evaluations, perfunctory examinations, and refusals by LaRosa and Blankenship to reevaluate him after ongoing complaints of pain.[5]

---

[5] West also submitted an article about a case against Wexford in Illinois wherein an inmate, upon arrival at Stateville Correctional Center, "received inadequate medical care and was denied [a] second surgery." An Illinois jury found that Wexford had a policy of denying elective surgeries in its provision of services to those incarcerated in the Illinois Department of Corrections' Northern Reception and Classification Center. *See Hall v. Funk*, No. 1-14-cv-6308, 2019 WL 1239707, at \*1 (N.D. Ill. Mar. 18, 2019), *appeal dismissed*, *Hall v. Wexford Health Sources, Inc.*, No. 19-1692, 2020 WL 6156604 (7th Cir. Feb. 24, 2020). While the case involved a different jurisdiction, the finding that

West included another article, updated in 2015, around the time of his accident, that FDC had awarded a new contract to Wexford to provide medical care to inmates in nine institutions in South Florida. The article specifically noted that Wexford had "1,092 malpractice claims . . . from aggrieved inmates from Jan. 1, 2008, through 2012." While not itself dispositive, this evidence supports a reasonable inference that complaints of substandard care under Wexford's administration were widespread and recurring, suggesting that systemic performance issues were not confined to a single facility or incident.[6]

The Majority Opinion contends that West's evidence of a pattern and practice of Wexford denying inmates necessary medical treatment deemed too costly is too remote to be relevant in the instant case. Yet, many of the allegations giving rise to West's

---

Wexford's centralized policies contributed to treatment denial for financial reasons lends contextual support to West's claim that his own care was restricted by similar corporate directives rather than individualized medical judgment.

[6] Although *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), holds that inadvertent failures or negligent medical care do not, by themselves, constitute deliberate indifference, West's evidence does not rest on mere negligence or a single lapse. Rather, he documented a decade-long pattern of systemic deficiencies under Wexford's administration—including repeated contract terminations for poor performance, chronic understaffing, and widespread delays in care across multiple facilities. These longstanding and recurrent failures go well beyond ordinary medical misjudgment and support a reasonable inference that Wexford's policies and practices reflected deliberate indifference to inmates' serious medical needs, consistent with *Estelle*.

complaint occurred in 2015, so the record necessarily includes data that reaches back several years from that date. Moreover, evidence of a "pattern and practice" may span a significant period of time. *See Lucente v. County of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) ("[P]laintiffs have presented sufficient evidence to create a genuine dispute of material fact as to the existence of an ongoing discriminatory policy by Suffolk County over several years (*arguably decades*) of ignoring and/or inadequately addressing the defendant's sexual misconduct with female inmates." (emphasis added)).

The temporal proximity of those reports compared to when West received inadequate treatment is not diminished simply because he presented a Wexford trend dating back over 20 years. If anything, the longevity of Wexford's policy, coupled with the treatment West received, viewed in the light most favorable to him, presents a fact question, not a legal one to be disposed of at the summary judgment stage. *See Vineyard v. County of Murray*, 990 F.2d 1207, 1212–13 (11th Cir. 1993) (evidence that the county's longstanding policies on supervision, training, and discipline were the moving force behind deputies' excessive force was sufficient to present a jury question, which would necessarily preclude summary judgment); *see also Brown v. City of Clewiston*, 848 F.2d 1534, 1543 (11th Cir. 1988) (Hatchett, J., dissenting) (explaining that where an individual "has demonstrated the existence of a material factual dispute regarding . . . [a] policy . . . [f]actual disputes of this nature are precisely the types of disputes which district courts should refrain from resolving on motions for summary judgment"). Overall, West's evidence paints a consistent picture:

Wexford's cost-containment and staffing practices were systemic and not facility-specific, longstanding, and repeatedly found to compromise patient care. A reasonable jury could thus conclude that Wexford's corporate directives—not the isolated judgment of individual clinicians—were the moving force behind the constitutional deprivation he alleges.

The core question, then, is whether Wexford's policies of limiting medical treatment were the motivating factor for why the medical providers denied West medical treatment for his "serious medical need." *Farrow,* 320 F.3d at 1243. If the evidence supports an inference that Wexford's corporate policies constrained its providers from making independent, patient-specific decisions, then those policies themselves could constitute deliberate indifference. A policy need not expressly forbid treatment to be unconstitutional; it suffices if it effectively prevents medical professionals from exercising individualized clinical judgment to address serious medical needs. *Cf. Johnson v. Lewis*, 83 F.4th 1319, 1329–30 (11th Cir. 2023) (reversing summary judgment where prison medical staff delayed treatment despite a valid prescription, noting that the Department of Corrections' policies, as applied, effectively constrained physicians from exercising independent professional judgment and could support a finding of deliberate indifference).

The Seventh Circuit, as an example, recognized this important point in *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) (*en banc*). In *Glisson*, a chronically ill incarcerated person received care from a private medical contractor, Corizon. *Id.* at

22-11541          ABUDU, J., Dissenting in part          13

374–75. While individual providers assessed him and occasionally made medical decisions, the contractor deliberately failed to implement centralized treatment protocols, did not ensure that his medical history was promptly reviewed, and ignored clear indicators of malnutrition and acute renal failure. *Id.* at 375–78. These policy choices constrained providers from making fully informed, patient-specific decisions—just as decisions here suggest Wexford's policies may have limited staff from exercising independent judgment to treat West's serious medical needs. *Id.* at 376–80. The court emphasized that the private contractor's failure to implement individualized treatment coordination could itself reflect deliberate indifference, noting that "[t]here is no magic number of injuries that must occur before [a defendant's] failure to act can be considered deliberately indifferent." *Id.* at 382.

To be sure, cost-awareness alone does not establish deliberate indifference. However, where, as here, an incarcerated person presents evidence that a national contractor applied uniform cost-containment measures that displaced individualized medical judgment, summary judgment in favor of the contractor is inappropriate. West's evidence, spanning multiple reports, investigations, and documented litigations, raises a genuine factual dispute as to whether Wexford's corporate practices prioritized cost over care. The question of whether this evidence establishes an unconstitutional pattern is not for us to resolve at summary judgment but for a factfinder. *Hicks*, 141 F.4th at 1180. Accordingly, summary judgment on this claim was improper.

14　　　　　　　　Abudu, J., Dissenting in part　　　　　　22-11541

*B. Spratt Was Not Entitled to Summary Judgment because the Eighth Amendment Prohibits Conduct That Exacerbates a Prisoner's Known Medical Condition.*

Finally, the Majority Opinion overlooks the evidence demonstrating that being forced to sit for hours on an upside-down trash can caused West additional pain beyond his already-documented chronic conditions. The Eighth Amendment prohibits not only the denial of medical care but also deliberate indifference to actions or conditions that exacerbate an inmate's known medical condition. *See Estelle*, 429 U.S. at 104–05 ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." (citation omitted)); *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) ("[T]o demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" (citation omitted)). In *Wade*, we recognized that the critical question under the Eighth Amendment is "whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" 106 F.4th at 1258 (quoting *Farmer*, 511 U.S. at 843).[7] To

---

[7] Although *Wade* described the risk as to a prisoner's "future health," the case involved an inmate with epilepsy whose medical needs were present upon incarceration. 106 F.4th at 1258 (quoting *Farmer*, 511 U.S. at 843 (citation omitted)). That makes the Court's focus on officials' awareness of risk directly

22-11541          ABUDU, J., Dissenting in part          15

prevail, a plaintiff asserting a deliberate indifference claim must show: (1) a substantial risk of serious harm, (2) the defendant's deliberate indifference to that risk, and (3) causation—that the defendant's conduct actually caused the alleged harm. *See Farmer*, 511 U.S. at 832–33; *Lane v. Philbin*, 835 F.3d 1307, 1311 (11th Cir. 2016); *Goebert*, 510 F.3d at 1326. The Majority Opinion concludes that West failed to provide evidence showing that Spratt's orders caused him additional pain beyond his preexisting chronic injuries. However, the record, viewed in West's favor, contains evidence that satisfies each element of the deliberate indifference standard and precludes summary judgment.

First, to demonstrate substantial risk of serious harm, West declared in his sworn interrogatories that sitting on an upside-down trash can caused him pain and numbness. West's fellow inmates corroborated his account. According to the people who lived and worked with West, he used a cane to walk and being forced to sit on a trash can visibly and significantly intensified his pain. Dameon Haynes, an incarcerated person who worked as a cook in the Food Service detail, "witnessed inmate West in obvious pain sitting on a garbage can and not a chair" on more than one occasion. Elijah West, who lived in the same dorm as West and worked with him in the food service, explained "I never heard West refuse to work, he did what his medical conditions would allow him to do, despite the pain he was suffering from Schultz and

applicable to West, whose chronic conditions were exacerbated by the defendants' actions.

Spratt, knowing the pain he was in still forced him to chop the vegetables while sitting in the awkward position." Michael Nungester, a former morning cook who worked in food service with West, said he saw West forced to sit on an upside-down garbage can and that West was "obviously in pain." This testimony establishes that the condition—sitting for prolonged periods on an inverted trash can—posed a substantial and obvious risk of serious harm to someone with West's chronic back condition.

The same evidence also supports the inference that Spratt knew of and disregarded this substantial risk. West's visible distress and repeated requests for proper seating made the risk apparent. His need for accommodations was documented in his medical file, and Spratt's continued insistence that he work while sitting on the trash can demonstrates conscious disregard rather than inadvertence. Under *Farmer*, deliberate indifference is satisfied when a prison official knows of and disregards an excessive risk to inmate health. 511 U.S. at 832–33. Here, the combination of West's visible pain, his documented restrictions, and Spratt's continued orders to work in that posture supports a reasonable jury finding that Spratt subjectively recognized and ignored the risk.

The record also supports a causal link between Spratt's conduct and West's increased pain. West's expert, Dr. Joseph Rashkin, produced a report that noted that West's pain was "aggravated by bending over, sitting, driving, or other postures which cause strain to the back." During his examination, Dr. Rashkin observed that West had "difficulty with posture or any activities such as stooping,

22-11541          ABUDU, J., Dissenting in part          17

lifting, sitting, and coming up right after sitting," and that "[s]itting appears to provoke pain." West also submitted a book chapter from two medical textbooks regarding osteoarthritis pain when sitting. The chapter on osteoarthritis highlighted that sitting in certain chairs "may worsen symptoms," and instructed people with osteoarthritis to use "straight-backed chairs with relatively high seats (such as kitchen or dining room chairs") when seated. Upside-down trash cans do not have backs, let alone straight backs. Second, West provided a textbook chapter on lower back pain, which included information that low back pain is caused by conditions such as herniated discs. The textbook instructed that a person with such conditions should avoid environments that stress the back and that movement "intensifies the pain" from herniated discs. The conditions Spratt imposed—prolonged sitting on a backless, uneven surface—are precisely those that medical literature identifies as exacerbating osteoarthritis and lower back pain.

While West's chronic pain predated his food-service assignment, the Eighth Amendment inquiry focuses not on the origin of his injury but on whether Spratt's conduct knowingly increased the severity of his suffering. *See Estelle* 429 U.S. at 104–05; *LaMarca*, 995 F.2d at 1535. A reasonable factfinder could determine that Spratt's order materially worsened West's condition, and that she acted with deliberate indifference by disregarding a risk apparent from West's visible pain and documented medical limitations. Accordingly, Spratt was not entitled to summary judgment. Viewing the record in the light most favorable to West, a jury could conclude

18                    ABUDU, J., Dissenting in part                22-11541

that Spratt's conduct went beyond mere negligence; rather, it could constitute deliberate indifference.[8]

## III.    CONCLUSION

For these reasons, I concur in part but respectfully dissent from the Majority's disposition of West's claims against Nurses Blankenship and LaRosa, as well as from the grant of summary judgment in favor of Wexford and Spratt.

---

[8] Studies have shown that one of the most difficult aspects of living with chronic pain is the denial of that suffering.  *See* Melina Nicola et al., *Invalidation of Chronic Pain: A Thematic Analysis of Pain Narratives*, Disability & Rehabilitation (July 10, 2019), [https://perma.cc/QC5L-9FJM].  Even seemingly minor postural changes can transform a dull ache into sharp or radiating pain. with chronic pain describe their experiences as ranging from a buzz under the skin to a lightning-bolt strike, or from the sensation of a bug crawling to multiple bee stings all in the same area.  These descriptions illustrate why a jury could find that forcing West to sit on an upside-down trash can, given his known condition, foreseeably intensified his suffering.  Imogene Munday et al., *'Barbed Wire Wrapped Around My Feet': Metaphor Use in Chronic Pain*, 25 BRIT. J. HEALTH PSYCH. 814 (2020), [https://perma.cc/R28B-XNGE].